**N.A. BURKITT, INC., Plaintiff,**

**v.**

**J.I. CASE CO., Defendant.**

**Civil No. 83–0094–P.**

United States District Court,
D. Maine.

Nov. 8, 1984.

John B. Graustein, Drummond, Woodsum, Plimpton & MacMahon, Portland, Me., for plaintiff.

David M. Hirshon, Thompson, Willard & McNaboe, Portland, Me., for defendant.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GENE CARTER, District Judge.

### I.

The Defendant manufactures construction equipment and sells it through dealers in Maine, including Plaintiff. By letter dated January 21, 1983, Defendant notified Plaintiff that because the Plaintiff had achieved inadequate sales volume, the Defendant was terminating the dealership agreement effective on April 23, 1983, or 90 days after Plaintiff's receipt of the letter, whichever was later. Plaintiff brought suit alleging that (1) Defendant had violated Maine's Regulations of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers, 10 M.R.S.A. §§ 1171, *et seq.* (Supp.1983) (the "1981 Act"); (2) Defendant had violated the 1975 version of the same act, 10 M.R.S.A. §§ 1171, *et seq.* (1964) *partially repealed by* 1981 Maine Laws ch. 331, §§ 4-6 & ch. 470, §§ A 23–25 (the "1975 Act"); and (3) Defendant had breached its agreement with Plaintiff. The dealership agreement had been entered into during 1979 and amended in 1980, while the 1975 Act was in force. The termination letter was sent after the effective date of the 1981 Act.

Defendant moved for partial summary judgment on the notice issues, contending that it had complied with the notice provisions of the 1975 Act and no more was necessary. The 1975 Act required that manufacturers provide a written notice of cancellation, setting forth the specific ground therefor, at least sixty days before the effective date of cancellation. 10 M.R. S.A. § 1174(3)(C) (prior to amendment). Plaintiff asserts that Defendant was required to comply with the 1981 Act, which repealed § 1174(3)(C), and enacted new no-

tice provisions including one that a manufacturer cancelling because of a dealer's inadequate sales or service performance provide the dealer with a six-month opportunity to cure the performance. *Id.* § 1174(3)(P)(2). Plaintiff also contends that Defendant has not complied with the notice provisions of the 1975 Act. Defendant counters that the 1981 amendments were not intended to apply to dealership agreements already in effect and that to apply them to agreements like the instant one would impair the obligation of contract, in violation of both the United States and Maine Constitutions.

On April 6, 1984, United States Magistrate D. Brock Hornby recommended that Defendant's motion be granted. He found that (1) Defendant had complied with the 1975 notice requirements; (2) the 1981 Amendments were intended to apply to dealership agreements already in effect at the time of their enactment; (3) the 1981 imposition of a six-month right-to-cure violated the Maine Constitution, article 1, section 11.

Plaintiff objected to the Magistrate's finding that application of the 1981 amendments to the instant franchise would violate the Maine Constitution and that the notice given by Defendant meets the requirements of the 1975 Act. Due to the importance of the constitutional issue, this Court ordered that supplemental briefs be filed and scheduled oral argument. Having carefully considered the record, including the recommended decision of the Magistrate and the written and oral presentations of counsel, the Court has determined that Maine law is consonant with federal law on impairment of contracts and that under the most recent pronouncement of federal law, *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), application of the 1981 amendments violated neither the Maine nor the United States Constitution.[1]

## II.

In analyzing the 1981 amendments, the Magistrate found that the legislature intended them to apply to dealership agreements already in effect. The Court adopts this sound conclusion. As the Magistrate states, the 1981 Act's repeal of the 1975 Act would leave a gap in coverage of preexisting dealerships if the 1981 Act does not apply to them. Moreover, to find that the legislature intended dealership agreements to be covered only by the law in effect when they were executed would create grave problems of enforcement.

The Magistrate's subsequent determination that application of the 1981 amendments to the instant dealership agreement violated the Maine Constitution relied on *Portland Savings Bank v. Landry*, 372 A.2d 573 (Me.1977), a case in which a statute reducing the redemption period of mortgages was found unconstitutional. In *Landry* the Law Court quoted both the Maine Law Court and United States Supreme Court and set forth the test for determining whether legislation impairs contractual obligations:

"The obligation of contract, in the constitutional sense, is the means provided by law by which it can be enforced,—by which the parties can be obliged to perform it. Whatever legislation lessens the efficacy of the means impairs the obligation. If it tends to postpone or retard the enforcement of the contract, the obligation of the latter is to that extent weakened."

Accord, *Canal National Bank v. School Administrative District*, 160 Me. 309 [203 A.2d 734] (1964). Thus, where a statute lessens the value of a contract to the parties, the constitutional prohibition has been violated. *See Bank of Minden v. Clement*, 256 U.S. 126, 128 [41 S.Ct. 408, 408, 65 L.Ed. 857] (1921); *Barton v. Conley*, 119 Me. 581 [112 A. 670] (1921),

---

1. The Court agrees with the Magistrate's finding that Defendant's termination of Plaintiff's dealership was both specific enough and early enough to comply with the 60-day notice requirement of the 1975 Act. This point is no longer an issue, however, given the Court's disposition of the constitutional issue regarding the 1981 Act.

*aff'd* 260 U.S. 677 [43 S.Ct. 238, 67 L.Ed. 456] (1923).

*Id.* (quoting *Phinney v. Phinney,* 81 Me. 450, 421, 17 A. 405 (1899), which quoted *Louisiana v. New Orleans,* 12 Otto 203, 206–07, 102 U.S. 203, 206–07, 26 L.Ed. 132 (1880)). Finding that *Landry* was Maine's latest pronouncement on the meaning of the contract clause, the Magistrate applied its test to find that the six-month right-to-cure " 'lessens the efficacy of the means' by which the manufacturer can enforce the contract and thereby 'lessens the value' of the contract to the manufacturer.' " Magistrate's Recommended Decision at 8.

Since the Law Court's decision in *Landry,* however, the United States Supreme Court has clarified the standard for determining violations of the Contract Clause of the United States Constitution in three major cases: *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); and most recently in *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569. In *Energy Reserves* the Court elucidated a three-pronged balancing test which contrasts sharply with the rights/remedies distinction set forth in *Landry.* In footnote 4 of his opinion, the Magistrate stated that in light of his finding based on the Maine Constitution "it is unnecessary to address the federal constitutional issue which, as the Defendant admitted at oral argument, is a much closer issue." Implicit, therefore, in the Magistrate's recommendation is a finding that the federal law on impairment of contract is diverging from that of Maine.

▮ In determining what the law of the forum state is, the federal judge is to use all the data available to him and decide what the judges of the highest state court would decide. *See* C. Wright, *Law of Federal Courts* 372 (1983). In most instances a relevant holding by the highest state court is the best evidence of how that Court would decide a given issue of state law. *See, for example, Industrial Consultants, Inc. v. H.S. Equities, Inc.,* 646 F.2d 746 (2d Cir.1981). That is not the case, however, if there are strongly persuasive reasons for the federal court's belief that the state's highest court would no longer adhere to its own decision. C. Wright, A. Miller and E. Cooper, 19 *Federal Practice and Procedure* § 4507 at 92. The First Circuit has pointed out that a federal court may anticipate a change in state law: "Of course, it is not necessary that a case be explicitly overruled in order to lose its persuasive force as an indication of what the law is." *Mason v. American Emery Wheel Works,* 241 F.2d 906, 909 (1st Cir.1957). In *Mason* the Court abolished Mississippi's privity requirement in tort actions, relying on the facts that the requirement was out of date and that the new trend had been mentioned in an opinion by the Mississippi Supreme Court: "We have no doubt that [when the issue is squarely presented], the Supreme Court of Mississippi will declare itself in agreement with the more enlightened and generally accepted doctrine." *Id.* at 910.

▮ Plaintiff urges the Court to anticipate that the Maine Court will employ the *Energy Reserves* balancing test in the future when confronting contract clause claims based both on the federal and state constitutions. This is, in the view of this Court, a sound prediction.

The language of both clauses is identical,[2] and the Law Court has made no distinction between the two in analyzing cases alleging a contract clause violation. *See, e.g., Bowman v. Maine State Employees Appeals Board,* 408 A.2d 688 (Me.1979); *Landry,* 372 A.2d 573; *In re Searsport Water Co.,* 118 Me. 382, 108 A. 452 (1919). In fact, in *Landry,* the case relied upon by

---

**2.** Article 1, Section 10 of the United States Constitution provides: "No State shall ... pass any ... law impairing the Obligation of Contracts." Article I, Section 11 of the Maine Declaration of Rights provides that "[t]he Legislature shall pass no ... law impairing the obligation of contracts...."

the Magistrate for his construction of the Maine contract clause, neither the Court nor the plaintiff articulated under which constitution the challenge to the new redemption law was brought. At the beginning of its analysis the Court recited language of the federal clause and then stated: "In its Declaration of Rights, the Constitution of Maine, art. I, § 11, contains a similar provision."

Perusal of Maine contract clause cases shows that the Law Court used federal and state cases interchangeably in its analysis of those issues. *See, e.g., Bowman v. Maine State Employees Appeals Board,* 408 A.2d 688; *Landry,* 372 A.2d 573; *Canal National Bank v. School Administrative District, No. 3,* 160 Me. 309, 203 A.2d 734 (1964). In fact, the test for impairment of contract obligations set forth in *Landry* was originally taken from a United States Supreme Court case. *Landry,* 372 A.2d at 576.

Given the similarity of the federal and state contract clauses and the Law Court's proclivity for following the federal court's construction of the contract clause in cases brought in Maine, it is likely that the Court will, in due course, change its approach to reflect the clarification of federal law set forth in *Energy Reserves.* Although the rights/remedies distinction had been the basis for determining contract impairment under the federal constitution for many years, a balancing approach had evolved in a long series of cases beginning with *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). In *Blaisdell* the Supreme Court acknowledged that in certain instances the contract clause prohibition must be accommodated to the inherent police power of the state. *Home Building & Loan Association v. Blaisdell,* 290 U.S. at 434, 54 S.Ct. at 238. The *Blaisdell* court set forth five factors bearing on its analysis, including whether the law impairing the conduct was an emergency measure and limited to the duration of the emergency. The *Landry* court acknowledged *Blaisdell* but found it inapposite since no emergency similar to the Great Depression existed in Maine in

1977. The Law Court in *Landry* also referred to and applied the Supreme Court's developing balancing test as articulated in *City of El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). The Court in *City of El Paso* had found constitutional a Texas law limiting reinstatement rights of interest-defaulting purchasers of land from the state when the previous statute had allowed perpetual redemption rights. The Court based its decision on the grounds that (1) the state had a vital interest in the orderly administration of its school lands program; (2) the old statute had had effects unintended by the legislature at the time it was enacted; and (3) the limitation did not affect anything that had served as consideration for the buyer's undertaking. *Id.* In considering *City of El Paso,* the Maine Court did not go through a detailed balancing analysis but did find that there was no important state interest advanced by the statute challenged in *Landry. Landry,* 372 A.2d at 577.

It appears then that Maine's highest court is attuned to and tends to follow changes in the federal law of contract impairment. This conclusion is bolstered by a concurring opinion joined by two Maine justices in the recent case of *Atlantic Oceanic Kampgrounds, Inc. v. Camden National Bank,* 473 A.2d 884, 887 (Me.1984) (Glassman and Roberts, J.J. concurring). In that case the majority had declined to address the constitutionality under the contract clause of the retroactive application of 14 M.R.S.A. § 6204–A, a statute providing for rebate to the mortgagee by the mortgagor of any surplus funds from a mortgage foreclosure sale. The concurring justices, however, thought it necessary to reach the constitutional issue. In their opinion, Justices Glassman and Roberts cited *Landry* as representative of traditional Maine contract clause jurisprudence: "Traditionally, we have, *consistent with United States Supreme Court doctrine,* drawn a distinction between statutes which affect contract rights and those which affect remedies." *Atlantic Oceanic Kampgrounds v. Camden National Bank,* 473 A.2d at 889. Not-

ing that the United States Supreme Court in *Energy Reserves* had enunciated a change in the traditional standard for evaluation of impairment of contractual obligations, the justices applied the *Energy Reserves* analysis to the issue before them. *Id.* at 890.

Although the concurring opinion is not a definitive pronouncement of Maine's highest court, it shows that at least these two concurring members of the court perceive Maine law as parallel to federal law on contract clause issues and that those two are willing to follow the Supreme Court's latest teaching on the subject. Since the perceptions of at least two justices coincide with those of this Court on the direction Maine law is likely to take, this Court, too, will apply the *Energy Reserves* balancing test to the case at hand.

### III.

◼ The threshold inquiry is " 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' " *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704–705, 74 L.Ed.2d at 580 (*quoting Allied Structural Steel Co. v. Spannaus,* 438 U.S. at 244, 98 S.Ct. at 2722). If a substantial impairment is found, the Court must inquire whether the state has a significant and legitimate public purpose behind the regulation. *Energy Reserves,* 459 U.S. at 412, 103 S.Ct. at 705, 74 L.Ed.2d at 581. If a legitimate public purpose is found, the final inquiry is "whether the adjustment of the rights and responsibilities of the contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* (*quoting United States Trust Co. v. New Jersey,* 431 U.S. at 22, 97 S.Ct. at 1517–1518).

### A.

◼ In determining whether the state law has caused a substantial impairment of Defendant's contractual rights, a major factor to be considered is whether the industry in which the parties are operating is heavily regulated. In *Energy Reserves* the Court found significant the fact that Kansas had extensively and intrusively regulated gas prices, even though it had not specifically regulated natural gas prices. Since the contracts were structured against the background of regulated gas prices, a statute that undercut the escalator clauses in the contracts did not constitute a substantial impairment. *Id.* 459 U.S. at 415, 103 S.Ct. at 707, 74 L.Ed.2d at 583.

In Maine an extensive system of regulation of business practices between motor vehicle manufacturers, distributors, and dealers was enacted by the legislature in 1975. 10 M.R.S.A. §§ 1171–86. The legislation, which predates the contract between the parties in this case, ordered almost every aspect of the relationship between dealers and manufacturers, including termination. *Id.* § 1174(3)(C). Thus, in Maine not only was there a general background of regulation against which the new termination provision should be judged, termination itself had actually been regulated. Just as in *Energy Reserves,* therefore, "regulation existed and was foreseeable as the type of law that would alter contract obligations." *Energy Reserves,* 459 U.S. at 416, 103 S.Ct. at 708, 74 L.Ed.2d at 584. Defendant argues that this is not the case, because nowhere in the instant contract is there any acknowledgment, as there was in the *Energy Reserves* contract, that the agreement was subject to relevant present and future state law. As the Court stated in *Energy Reserves,* that provision demonstrates what *Energy Reserves'* reasonable expectations were.

◼ In the instant case the parties' reasonable expectations upon entering into their contract were that certain aspects of their ability to terminate their relationship would not be subject to their absolute control because they would be regulated for fairness. As Justice Holmes stated long ago, "[O]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co. v. McCarter,* 209 U.S. 349, 357,

28 S.Ct. 529, 531, 52 L.Ed. 828 (1908). Thus, although the contract between the parties permitted termination "for any reason" on appropriate notice, the statute in effect at the time of their agreement made clear that the manufacturer could only terminate for "due cause." The 1981 amendments to the statute merely changed the standard for termination from due cause to good cause and delayed enforcement of termination for failure of sales or service by interjecting a six-month cure period. Since Defendant had entered a field in which fairness of termination was one of many business practices regulated, his reasonable expectations were not impaired by the heightened standard of that regulation. His substantive ability to terminate the dealership under the contract was not significantly restricted; rather, the procedure was circumscribed.

### B.

Even if the 1981 amendment were found to cause a significant impairment of Defendant's contractual interests, the Court has no doubt that the 1981 amendments to Maine's laws regulating business practices between motor vehicle manufacturers and dealers are a valid exercise of Maine's police power. The State of Maine has delineated in the challenged section a significant and legitimate interest in regulating business practices within the state to eliminate the "unfair methods of competition and unfair and deceptive practices." 10 M.R.S.A. § 1174. By so doing it can foster a salubrious and more stable business climate for *all* businesses with Maine, thus aiding the state economy. Also important is the secondary benefit that inures to Maine consumers by the prevention of arbitrary or hasty terminations of local dealerships.

### C.

■ In assessing the reasonableness and necessity of a particular legislative measure, "courts properly defer to legislative judgment" unless the state itself is a contracting party. *United States Trust Co. v.*

*New Jersey*, 431 U.S. at 22–23, 97 S.Ct. at 1517–1518. Here the Court can properly defer for the regulatory measure is narrowly drawn. When the manufacturer's concern is with a failure of performance, the regulation affords an opportunity for the dealer, when notified of the problem, to correct it, which presumably is to the advantage of both parties. The right-to-cure is limited, however, to six months so the possible losses to the manufacturer are circumscribed if cure is not possible.

■ The 1981 amendments to Maine's dealership laws do not work a substantial impairment of Defendant's contractual rights under *Energy Reserves*. Even if they did, however, the state has a legitimate and significant purpose underlying this exercise of its police power, and it has achieved this purpose with a statute that is narrowly drawn to achieve that purpose.

Accordingly, it is ORDERED that the recommended decision of the Magistrate be, and is hereby, DISAPPROVED. Defendant's Motion for Partial Summary Judgment on the Notice Issues is hereby DENIED.

So ORDERED.